## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Case No. 8:08CR242 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| TRINIDAD VILLA-GONZALEZ and | ) | |
| JOSE MANUEL VILLA-GONZALEZ, | ) | |
| | ) | |
| Defendants. | ) | |

This case is before the court on the Motion to Suppress (#26) filed by defendant Trinidad Villa-Gonzalez, and the Motions to Suppress Evidence (#28) and Statements (#29) filed by codefendant Jose Villa-Gonzalez. An evidentiary hearing on the motions was held on November 18, 2008. The transcript of the hearing (#43) was filed on December 4, 2008, at which time the motions were deemed submitted.

## I. INTRODUCTION

On the morning of May 29, 2008, officers of the Nebraska State Patrol conducted a knock-and-talk inquiry at the defendants' mobile home near Columbus, Nebraska in furtherance of an ongoing drug investigation. After the defendants refused to allow the officers to search the residence, State Patrol Investigator Keith Bignell contacted Immigration and Customs Enforcement (ICE) investigator Mike Becker and asked him to run immigration checks on the defendants and Esau Valenzuela-Machado, who was outside the residence.

Becker, who was in Omaha, checked immigration records and then interviewed the three men by telephone. Jose Villa-Gonzalez and Esau Valenzuela-Machado both

admitted to Becker that they were illegal; however, Trinidad Villa-Gonzalez stated he had entered the United States legally in June 2007 with a passport and visa, and the passport and visa were in his house.  Becker conducted more records checks, but was unable to find any record of Trinidad entering the United States with a passport and visa.  He also discovered that Trinidad had an adverse immigration record.  Becker directed Bignell to detain all three of the individuals in Columbus so that he could initiate administrative deportation proceedings.

The defendants and Valenzuela were taken to the Platte County jail in Columbus. Becker traveled from Omaha to Columbus and interviewed them on the afternoon of May 29, 2008, as part of the administrative removal process.  Becker did not give them any *Miranda* warnings.  During this administrative interview, Trinidad Villa-Gonzalez indicated that he had entered the United States using a passport and a visa that had a picture belonging to someone else.

Based on Trinidad's admission and prior statement that his visa and passport were in his house, Becker's supervisor, Greg Jensen, obtained a search warrant for the defendants' mobile home authorizing law enforcement to search for evidence of immigration law violations.

State Patrol Investigator Bignell was part of the team that executed the warrant.  He found a quantity of methamphetamine hidden above the ceiling fixture in the kitchen, a location disclosed to him during a proffer interview in his drug investigation.   Bignell went back to the jail and filed arrest affidavits on all three individuals.  Bignell interviewed Valenzuela, Trinidad, and Jose on May 30, 2008 after giving them their *Miranda* warnings.

In their motions to suppress, the defendants contend their statements should be suppressed pursuant to *Miranda v. Arizona*. They also challenge the validity of the search warrant on various grounds, and contend the officers exceeded the scope of the search warrant.

For the reasons explained below, I recommend that the motions to suppress statements be granted in part as to both defendants, but that the motions to suppress physical evidence be denied.

## II.  FACTUAL BACKGROUND

Keith Allen Bignell testified that he is a drug investigator employed by the Nebraska State Patrol. On May 29, 2008 while working the day shift, he drove an unmarked vehicle (10:10-11) past a trailer house at 5472 61st Avenue in Columbus, Nebraska (9:4-6). He was interested in the trailer because he had received information through a federal proffer interview that the occupants of the trailer, Trini Villa and his brother, possessed and sold methamphetamine at the trailer (10:2-5).

Bignell had driven past the trailer on numerous occasions since receiving the tip, but had never observed any vehicles or observed anyone outside. On this particular day, however, he observed a vehicle in front of the trailer and an individual standing outside the trailer. After contact with Nebraska State Patrol Trooper Dain Hicks and Investigator Molczyk of the Columbus police department, it was decided that Bignell, along with other officers, would approach the trailer for a consensual contact (10:16-21).

Bignell was dressed in blue jeans, t-shirt, and a vest with the words "police" on the front and back (10:12-15). As he and the other officers approached the trailer, Bignell

-3-

again observed an individual identified as Esau Valenzuela-Machado ("Valenzuela"), standing near the front of the trailer. Bignell asked Valenzuela for identification and was provided a Mexican voter registration card. Experiencing a language barrier, Bignell pointed towards the trailer and asked Valenzuela if he had any friends or amigos in the trailer (11:11-20). Valenzuela nodded his head indicating that someone was in the trailer. Bignell asked Valenzuela to accompany Trooper Hicks to the front of the trailer as Bignell and Investigator Molczyk went to the door of the trailer and knocked.

The knock was answered by Jose Villa-Gonzalez ("Jose"). Jose was asked for identification. Jose turned around and Bignell asked him if he could come inside. At that time Bignell was met at the door by Trinidad Villa-Gonzalez ("Trinidad"). Trinidad told Bignell that he could not come inside. Bignell recognized Trinidad and asked him for some identification. Trinidad then entered the trailer and closed the door, but returned with a Nebraska identification card and had a brief conversation with Bignell (12:2-12).

Bignell testified that the conversation took place on the porch of the trailer, which he described as a wooden deck on the exterior of the trailer that led to the main door to the trailer. Bignell observed that Trinidad appeared to understand English and responded to his questions in English (13:16-21). During the conversation Bignell asked Trinidad a series of questions which Trinidad answered. Trinidad told Bignell that he owned the trailer, that his brother Jose lived there, and Jose was getting his identification. About that time, Jose returned to the door and handed Bignell a Washington driver's license. Trinidad asked Bignell what he wanted and Bignell informed him that he worked for the State Patrol and he believed that Trinidad and Jose were drug dealers. Trinidad denied the allegation.

-4-

Bignell then asked Trinidad a few more questions regarding where he was born and if he had any other forms of identification.  Trinidad replied that he was born in Mexico and did not have any other forms of identification.  Bignell then asked Trinidad for permission to search the trailer.  Trinidad told Bignell he could not search the trailer (14:6-16).

Bignell then telephoned an immigration investigator, Mike Becker, to run checks on all three individuals through immigration.  Becker told Bignell that he would call him back when he was at a computer and could run the checks (14:17-23).  Bignell then returned to his cruiser and Investigator Molczyk remained on the deck with Trinidad.  Jose was still inside the trailer.  (15:7-12).

About five minutes later Becker returned the call and Bignell provided Becker with the names and the identifications he had received from the three individuals.  Becker informed Bignell that he wanted to speak with each of the individuals on the cell phone. No *Miranda* warnings were administered before Becker spoke to the defendants on the telephone because, at that time, Becker was only starting the administrative removal process.  (93:5-9).

Bignell first approached Trinidad on the deck and handed him the cell phone.  After Becker spoke with Trinidad, Bignell spoke again with Becker.  Becker told Bignell that Trinidad should be administratively arrested.  Becker advised that he was on his way from Omaha to the Platte County Sheriff's office, where he would meet with Trinidad.

Bignell then opened the door to the trailer, stepped inside, and  handed the phone to Jose, who also had a conversation with Becker.  Becker told Bignell that Jose should

also be administratively arrested and held for further questioning at the Platte County jail (16:23-17:3).

Bignell then handed the phone to Valenzuela (it is unclear from the record where Valenzuela was when he was given the phone), who also spoke with Becker.  After that conversation Becker requested that Bignell hold Valenzuela under an administrative arrest.

Bignell testified that the conversations on the phone between the defendants and Becker occurred in Spanish with Jose and Valenzuela and in English as to Trinidad (17:16-18). Two marked State Patrol units came to transport the three men to the Platte County detention facility where they were met approximately two hours later by Deportation Officer Becker, Deportation Officer Dan Archer and a third ICE officer.  Bignell and Investigator Molczyk remained at the trailer for 30 to 45 minutes and called for the drug dog.  (18:15-18; 35:8).  The trailer was locked, and they did not enter the trailer.  (35:11-18).

Bignell testified that after Becker arrived at the Platte County facility and spoke to Trinidad, Becker told him that he was certain Trinidad had been deported before and had re-entered the United States by false document and that he was going to apply for a search warrant to search the trailer (19:5-12).  At about 1:00 PM, Bignell returned to the trailer to secure it until the search warrant was executed.

Becker obtained a search warrant, which was executed at about 6:00 PM.  Bignell was part of the team that executed the warrant, resulting in the seizure of $32,000 in United States currency, two handguns, and methamphetamine.  Following the service of

the search warrant, Bignell went back to the jail and filed arrest affidavits on all three of the individuals.

Bignell testified that on May 30, 2008 he again had contact with the three individuals from the trailer, along with Investigator Molczyk and an interpreter, Angelica Lopez, at the Platte County detention facility.  He first interviewed Valenzuela followed by Trinidad and then Jose.

Before beginning his interview with Trinidad he advised Trinidad of his *Miranda* warnings from a card and questioned him.  An audio recording of the interview (Ex. 2) was made.  Bignell then interviewed Jose and again an audio recording (Ex. 3) was made.  On cross-examination Bignell admitted that while questioning Jose, he yelled at him and called him a liar (38:23-39:12).  Bignell admitted on re-cross that the drugs located during the execution of the search warrant above the ceiling fixture in the kitchen matched the location disclosed earlier during the proffer interview (55:8-22).

Michael Becker testified he is a Deportation Officer with the United States Immigration and Customs Enforcement (ICE), primarily handling administrative removals of aliens from the United States.  On May 29, 2008 at approximately 10:30 AM, he received a call from Investigator Keith Bignell of the Nebraska State Patrol.  Bignell explained that he had some aliens he was investigating in Columbus, Nebraska.  Becker asked Bignell to provide him the names and dates of birth of the individuals.  After receiving the information, Becker ran the data through his systems (58:15-25).  The Central Index System (CIS) showed that Jose had a previous adverse contact with Immigration authorities.  (88:15-24).  The presence of an adverse contact record suggested

-7-

to Becker that Jose was not lawfully in the country.  (90:9-18).  The other two individuals were not in the system.  (60:12-25).  Becker then told Bignell that he wanted to speak with each of the individuals on the phone.  After the conversations he determined that two of them were in the United States illegally and the third, Trinidad, alleged that he was legal, stating that he possessed a passport and visa (61:2-10).

DO Becker testified that he had asked all the aliens where they were from and if they had immigration papers to be in the United States (61:12-14).  Becker determined that Jose was illegal by asking him in Spanish, "are you illegal?" and Jose responding "yes" in Spanish (62:9-12).  A conversation occurred in Spanish with Valenzuela, who also admitted he was illegal (62:13-16).

Becker then spoke with Trinidad in English.  Trinidad stated that he was legally in the United States.  Specifically, Becker identified himself as an immigration officer and asked Trinidad to provide his place of birth and immigration status in the United States.  Trinidad stated he was from Sinaloa, Mexico, and that he was legal, having entered with a passport and visa in June of 2007.  (77:15-20).  Becker asked Trinidad where his documents were and Trinidad told him that they were in the house (62:17-25).

Becker then spoke with Bignell and directed him to detain all three of the individuals.  On further checking on Trinidad's date of birth, Becker determined that Trinidad had an adverse immigration record under a substantially different date of birth, so Becker then ran the name and date of birth provided by the officers as well as the name and date of birth based upon the documents that Trinidad carried.  He concluded that all three were aliens in the United States (63:7-20).

-8-

Becker determined that since the Platte County jail was not an approved facility[1] for detaining individuals who are under administrative arrest or detention, he would travel to Columbus to interview the three men.  En route from Omaha to Columbus, Becker and DO Archer found specific adverse immigration records involving Jose Villa-Gonzalez.  (88:11-89:20).

Becker and Archer arrived in Columbus at around 1:30 PM.  According to DO Becker, their objective was to determine whether Trinidad was lawfully in the United States.  Becker noted that sometimes there are errors in the ICE databases; if Trinidad claimed that he entered with a passport and visa, he could possibly be legal, but they wanted to make sure of that.  Becker observed that the government's computer databases could be in error, or that data at a port of entry may have been omitted or not correctly entered into the system.  Thus, it was important to determine the details of Trinidad's entry into the United States.  (79:1-15).

Becker was instructed by his supervisor to conduct interviews, fax the Form I-213 reports of the interviews, and the supervisor would then "get the event started" to process the aliens for removal from the United States.  (64:10-65:8).

DO Becker personally interviewed Trinidad Villa-Gonzalez.  He described the nature of the interview as

> an identity interview.  It's an identity interview with regard to their name, date of birth, family's name, do they have kids, are they married, are they sick, where do they live, where were they born, and then we have their entry data, because under the Immigration and Nationality Act, how an alien enters the

_____

[1]Approved facilities are located in Omaha, Nebraska and Council Bluffs, Iowa.

> United States determines with which course of action that you actually take in the administrative process ... for removal.
>
> For example, if a person just crosses the river illegally, then they're charged under Section 212 of the Immigration and Nationality Act for the ... administrative functions before an immigration judge.  If, for example, they ... enter at a port of entry and they're admitted into the United States, then they're charged under Section 237 of the Immigration and Nationality Act as ... someone that's been admitted, and that's the ... track that you use before an immigration judge.

(66:10-67:2).

Becker testified that his practice is to always ask the aliens he deals with whether they have been deported before, because if someone has been deported before, their mere presence again in the United States was a felony.  In that event, Becker would be required to process the individual for a "reinstatement of removal," and Becker would Mirandize the individual because of the potential criminal liabilities.

Becker testified that he was not aware of any unlawful activity by the defendants other than administrative violations of the Immigration and Nationality Act.  (67:22-23).  He began the interview with Trinidad by

> asking him what his mom and dad's name was and I wrote this information down, and then I asked him what his address was, and I actually had him write his address on the back of the form as well as where he was born because where he told me he was born, I couldn't ... spell it. My Spanish isn't quick enough to pick up – to spell it out, so I laid it out for him, and he wrote on the back of the form and then I kind of highlighted, okay, does this mean the state of Mexico, does this mean the city of Mexico, and – and so on and so forth. He goes, yeah, yeah, that's fine.

68:16-69:1).

Becker then asked Trinidad and about his story that he came into the United States with a passport and a visa.  Becker informed Trinidad that he did not have any record of

Trinidad coming with a passport and visa.  Trinidad then responded that he came with a

passport and a visa that had a picture belonging to someone else.  This statement alerted

Becker that Trinidad had entered the country on an imposter or fraudulent document

(69:2-10).  Becker noted that by making such an  admission, Trinidad had admitted to a

federal felony.

Becker testified that he immediately stopped questioning Trinidad and gave him a

"Form I-826," (Exhibit 1) which Becker described as a combination document notifying

aliens that they have certain administrative rights before an immigration judge, that they

can talk to a counselor or an officer of their consulate if they so choose, and giving them

a number of options as to how they can proceed.  Trinidad read the form, and checked off

on the bottom of the form that he had entered illegally and wanted a voluntary return to

Mexico.  (69:20-71:16).  Trinidad remained under administrative arrest.  (78:20-23).

As Becker left the interview room he observed Investigator Molczyk and told him,

"You're not going to believe what this guy just told me....  He told me he entered the United

States with counterfeit documents or fraudulent-type documents."  Becker told Molczyk he

would "bet dollars to pesos" that the fraudulent documents were hidden in the house

because aliens don't usually give up stuff like that (71:18-72:3).  Becker determined that

he would attempt to get a search warrant for the trailer to locate the documents.

Becker noted that he had driven to Columbus to take administrative custody of

aliens; however the dynamics changed after Trinidad's admission.  He and DO Archer

drafted an application for a search warrant and faxed it to their supervisor, Greg Jensen.

The warrant was issued by the undersigned on May 29, 2008, and authorizes a search of

the premises for

> the following documents in the names of, but not limited to, Trinidad VILLA-Gonzalez:
>
> a. Passports
> b. Immigration papers
> c. Resident alien cards
> d. Social Security cards
> e. Identification documents
> f. Any evidence of employment in the United States
> g. Applications for documents or cards relating to immigration, taxes or social security
> h. Documents bearing a photograph of Trinidad VILLA-Gonzalez
> i. Bank records, checks, credit card information, account information, and other financial records
> j. Books, papers, records, receipts, notes ledgers, documents, or papers, telephone books, and evidence of occupancy/ownership of premises and storage locations used in connection with the use, sale and distribution of identity documents in violation of the laws of the United States.

(Ex. 4).

On cross-examination Becker testified that the only reason he got the search

warrant was because Trinidad admitted to entering the United States with documents of

another. (76:15-22). He did not ask Trinidad to retrieve the documents. (80:7).

Becker denied knowing the details of the State Patrol's drug investigation; however,

he was aware that the officers went out to the trailer initially for a knock-and-talk to obtain

access to the premises (81:7-15; 82:15-23). He knew that they, apparently, had

information that drugs had been sold out of the place. Becker testified that he did not know

anything about the actual drug investigation, or that the State Patrol had tried to gain

-12-

access because they thought there were drugs on the premises, until he arrived in Columbus.  Becker testified that he had traveled to Columbus

> with the expectation of being an immigration officer.  I was going to take their problem out of their town. That was ... how I got involved in this meaning that – because we don't as a matter of routine write search warrants or get involved too heavily in the criminal investigative aspects of aliens.
>     ... Part of our mandate is to help state and local law enforcement officers deal with their alien problems.  I was basically being their cleanup guy.  I was going to take custody of aliens that they thought [were] slinging dope up in Columbus and  ... get them out of the picture[.]

(83:7-19).

Dain Hicks testified that he is a ten-year employee of the Nebraska State Patrol, currently assigned to traffic services.   On May 29, 2008 after receiving a call from Investigator Bignell, he responded to a trailer house where he made contact with Valenzuela in front of the trailer (97:7-20).  After placing Valenzuela in his patrol unit, Hicks went to the front of the trailer and observed Investigator Bignell and Investigator Molczyk make contact with Trinidad.  At some point Hicks and Investigator Bignell entered the trailer.  Hicks observed Jose have a phone conversation by use of a speaker phone and after that conversation was completed, he observed Jose being placed under arrest (97:11-18).  Hicks noted that during the phone conversation which was conducted in Spanish, that Jose did not have handcuffs on (98:9-25).

On cross-examination Hicks testified that he does not speak Spanish, so he could not follow the conversation on the speaker phone that involved Jose (101:9-18).  Hicks also testified that he never observed Trinidad with handcuffs on (103:3-6).

-13-

Jose Manuel Villa-Gonzalez testified that on May 29, 2008 he was residing in a trailer at 5472 61st Avenue in Columbus, Nebraska. He noted he does not speak English (107:2-6). On the date in question, he observed officers come to his house and knock. As he opened the door he told his brother Trinidad that the police were there. Trinidad told Jose to get his ID from his room. Jose got Trinidad's wallet with ID and his ID and gave it to Trinidad. Trinidad then went outside and gave the identification to the officers (107:14-21). Jose denies that he ever left the trailer and further states that he observed Trinidad arrested and handcuffed (108:11-15). He also observed the officer enter the trailer, arrest and handcuff him, before placing him in a chair where he sat for about forty minutes to an hour (108:11-19).

Jose testified that an officer later entered the trailer and asked him if he had immigration papers. Jose told him no. The officer told Jose that he was going to speak with an immigration agent. The officer then placed a phone by Jose's ear and the person on the phone asked Jose if he had papers. Later the officer took the phone, spoke with someone, hung up the phone, and took Jose to the patrol car (108:21-109:2). On cross-examination Jose testified that the officer he had contact with in the trailer was Investigator Bignell.

### III. LEGAL ANALYSIS

**A. Initial Encounter**

Encounters between the police and citizens fall into three general categories: (1) consensual or voluntary encounters, which are not seizures and do not implicate the Fourth Amendment, *see, e.g., Florida v. Bostick*, 501 U.S. 429 (1991); *Florida v. Royer*, 460 U.S.

-14-

491 (1983); (2) investigative detentions, which are seizures of limited scope and duration within the meaning of the Fourth Amendment and must be supported by a reasonable articulable suspicion of criminal activity, *see, e.g., Terry v. Ohio*, 392 U.S.1 (1968); *Reid v. Georgia*, 448 U.S. 438 (1980); *United States v. Sokolow*, 490 U.S. 1 (1989); and (3) physical arrests, which must be supported by probable cause. *See generally United States v. Johnson*, 326 F.3d 1018, 1021 (8th Cir.), *cert. denied*, 540 U.S. 962 (2003).

In this case, Investigator Bignell initially attempted to obtain information from Valenzuela and the defendants through consensual conversation. The Eighth Circuit has recognized that a "knock and talk" inquiry is a reasonable investigative technique, as long as the encounter does not become coercive. *See United States v. Weston*, 443 F.3d 661, 667 (8th Cir.), *cert. denied*, 549 U.S. 956 (2006); *United States v. Spotted Elk*, 548 F.3d 641, 655 (8th Cir. 2008). The officers' presence outside the defendants' residence did not violate the defendants' Fourth Amendment rights. "Where a legitimate law enforcement objective exists, a warrantless entry into the curtilage is not unreasonable under the Fourth Amendment, provided that the intrusion upon one's privacy is limited." *United States v. Weston*, 443 F.3d at 667. Nor does it violate the Fourth Amendment "merely to knock on a door without probable cause." *United States v. Spotted Elk*, 548 F.3d at 655.

"A consensual encounter becomes a seizure implicating the Fourth Amendment when, considering the totality of the circumstances, the questioning is 'so intimidating, threatening, or coercive that a reasonable person would not have believed himself free to leave.'" *United States v. Flores-Sandoval*, 474 F.3d 1142, 1145 (8th Cir. 2007). The court considers the totality of the circumstances in determining whether a seizure occurred. *Id*.

-15-

> Factors indicating a seizure are: the presence of several officers, a display
> of a weapon by an officer, physical touching of the person, or the "use of
> language or tone of voice indicating that compliance with the officer's request
> might be compelled." [Citations omitted.]  A seizure occurs when the officer,
> "by means of physical force or show of authority, has in some way restrained
> the liberty" of a suspect....

*United States v. Flores-Sandoval*, 474 F.3d at 1145.    Police questioning, in itself, does

not constitute a seizure.    *Id*.    When a person is questioned "on his own turf," the

surroundings are usually "not indicative of the type of inherently coercive setting that

normally accompanies a custodial interrogation."  *See United States v. Czichray*, 378 F.3d

822, 826 (8th Cir. 2004), 544 U.S. 1060 (2005).  The question is whether, under the totality

of  the  circumstances,  the  defendants'  liberty  was  restrained  in  such  a  way  that  a

reasonable,  innocent  person  would  not  feel  free  to  leave.    *United States v. Flores-

Sandoval*, 474 F.3d at 1145.

In this case, Investigators Bignell and Molcyzk approached the defendants' trailer,

and Bignell knocked on the defendants' door and talked to both Jose and Trinidad at the

door.  Bignell was told he could not come in.  Both men provided identification.  Jose did

not  come  outside,  but  Trinidad  spoke  with  Bignell  on  the  front  deck.    During  this

conversation, Bignell informed Trinidad that he worked for the State Patrol and he believed

that Trinidad and Jose were drug dealers.  Trinidad denied the allegation and refused to

permit Bignell to search the trailer.

Up to this point, the record does not suggest that Trinidad and Jose were coerced

into talking to the police or that they were susceptible to any pressure that may have been

asserted by the officers.  Indeed, they affirmatively refused to allow the officers into the

-16-

residence or to search the residence.  *See United States v. Dehghani*, 2008 WL 5273966 at *2-3, Case No. 08-1518 (8th Cir., Dec. 22, 2008).

### B. Telephone Conversations with Deportation Officer Becker

The defendants were both asked for identification by Bignell and Becker.  Requests for routine biographical data are exempted from the requirements of *Miranda v. Arizona*, 384 U.S. 436 (1966).  *See Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990); *United States v. Brown*, 101 F.3d 1272, 1274 (8th Cir. 1996).   Bignell obtained the biographical information from the defendants and gave it to Becker, who, in turn, searched immigration records for information about the defendants.  Becker then told Bignell he wanted to speak to the individuals on the telephone.

Bignell approached Trinidad on the deck and handed him a cell phone, at which time Trinidad spoke with Officer Becker.  There is no evidence that Trinidad objected to talking to Becker on the telephone or that he was forced to do so.

Next, Bignell opened the door to the trailer, stepped inside, and handed the phone to Jose, who also talked to Becker over the telephone.  Even assuming that Bignell acted improperly by entering the trailer without permission, there is no credible evidence that Jose objected to talking to Becker on the telephone or that he was forced to do so.  Jose testified that he was in handcuffs when this conversation occurred; however, officers Bignell and Hicks testified credibly that Jose was not placed in handcuffs until after the conversation with Becker.  The court finds the officers' testimony to be more credible on this point, and finds that Jose Villa-Gonzalez was not handcuffed or physically restrained when he spoke to DO Becker on the telephone.

-17-

During the telephone conversations, and acting within the scope of his authority under 8 U.S.C. § 1357(a), Becker asked the defendants where they were from and if they had immigration papers to be in the United States. (57:11-58:5). Becker determined that Jose was illegal by asking him in Spanish, "are you illegal?" and Jose responding "yes" in Spanish.

Section 1357(a)(1) authorizes Immigration and Customs Enforcement agents "to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States." "While this statute presumably authorizes ICE agents to stop, detain and question suspects, it does not obviate the need for *Miranda* warnings where they are otherwise required." *United States v. Vasquez-Martinez*, 2006 WL 376474, Case No. 6:05CR60016 (W.D. Ark., Feb. 9, 2006) (citing *United States v. Flores-Sandoval*, 422 F.3d 711, 714 (8th Cir. 2005)).

*Miranda* warnings are required when an individual is interrogated while in police custody. A custodial interrogation involves questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. *United States v. Chamberlain*, 163 F.3d 499, 502 (8th Cir. 1999) (citing *Miranda v. Arizona*, 384 U.S. 436 (1966)). Absent a formal arrest, the police must give *Miranda* warnings when the suspect's freedom of movement is restricted to a degree akin to a formal arrest. *United States v. Ollie*, 442 F.3d 1135, 1137 (8th Cir. 2006) (citing *California v. Beheler*, 463 U.S. 1121, 1125 (1983)).

> The ultimate question in determining whether a person is in "custody" for purposes of *Miranda* is "whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."

-18-

> *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (internal quotation omitted). The "only relevant inquiry" in considering that question is how a reasonable person in [the defendant's] position would have understood his situation. *Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984); *see generally Yarborough v. Alvarado,* 541 U.S. 652, ---- - ----, 124 S.Ct. 2140, 2147-50, 158 L.Ed.2d 938 (2004). In making that evaluation, we consider the totality of the circumstances that confronted the defendant at the time of questioning. *United States v. Axsom,* 289 F.3d 496, 500 (8th Cir. 2002).

*United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004), *cert. denied*, 544 U.S. 1060 (2005).

It is disturbing that Bignell entered the defendants' trailer without permission in order to present the telephone to Jose; however, the court does not find credible Jose's testimony that he was handcuffed prior to his telephone conversation with Becker. Considering the totality of the circumstances, the court finds that the defendants' freedom of movement was not restricted to a degree akin to a formal arrest, and neither Trinidad nor Jose Villa-Gonzalez were "in custody" when they talked to Officer Becker on the telephone.

## C. The Administrative Arrests

Officer Becker was able to determine that the defendants were aliens in the United States. Jose Villa-Gonzalez had admitted to Becker he was in the country illegally, Becker knew Jose had an adverse immigration record, and Becker could not find any record that Trinidad entered the United States with a visa or passport in 2007. By the end of the telephone conversations, Becker was unable to verify that the defendants were lawfully present in the United States; therefore, Becker asked Bignell to detain them. The court

-19-

finds that the officers had reasonable suspicion that the defendants had violated immigration laws and were allowed to detain them for further investigation.

### D.  Interrogation at the Platte County Jail

Becker interviewed the defendants at the Platte County jail on the afternoon of May 29, 2008.  He did not administer any *Miranda* warnings.  The obligation to administer *Miranda* warnings in this context was discussed in *United States v. Lopez-Chamu*, 373 F. Supp. 2d 1014, 1017-18 (C.D. Cal. 2005):  "in the immigration setting, like in all other contexts, the application of *Miranda* turns on whether there was an "interrogation" within the meaning of *Miranda*.  "If an INS investigator has no reason to suspect that the question asked is likely to elicit an incriminating response, there is no interrogation and, therefore, no *Miranda* violation."  *Id*.  In contrast, 'in-custody questioning by INS investigators **must** be preceded by *Miranda* warnings, if the questioning is reasonably likely to elicit an incriminating response.'"

### 1.  Trinidad Vera-Gonzalez

Trinidad Vera-Gonzalez was unquestionably in custody, and DO Becker was authorized to "interrogate" him pursuant to 8 U.S.C. § 1357(a)(1).  Becker asked Trinidad about his story that he came into the United States with a passport and a visa, and told Trinidad that ICE did not have any record of Trinidad entering the country with a passport and visa.  Trinidad responded that he came with a passport and a visa that had a picture belonging to someone else.

Again, while § 1357(a)(1) authorizes immigration officers to stop, detain and question suspects, it does not obviate the need for *Miranda* warnings where they are

otherwise required.  *United States v. Vasquez-Martinez*, 2006 WL 376474, Case No. 6:05CR60016 (W.D. Ark., Feb. 9, 2006) (citing *United States v. Flores-Sandoval*, 422 F.3d 711, 714 (8th Cir. 2005)).  "*Miranda* warnings are required whenever a person is in custody and subjected to questioning, regardless of which governmental agency or entity is questioning the detainee."  *United States v. Bonilla-Siciliano*, 2008 WL 1820828 at *5, Case No. 06-305 (W.D. Mo., Apr. 18, 2008) (citing *United States v. Mathis*, 391 U.S. 1, 4-5 (1968)).

The court has considered several recent decisions in which the district judges rejected the government's arguments that ICE agents were not required to Mirandize persons in their custody because their questions were being posed for processing and administrative purposes, and not for the purpose of seeking evidence in a criminal matter.

> The court acknowledges that "[r]outine questioning by customs officials is normally not custodial interrogation that triggers a *Miranda* warning." *United States v. Layne*, 973 F.2d 1417, 1420 (8th Cir.1992) (citing *United States v. Troise*, 796 F.2d 310, 314 (9th Cir.1986)); *see also id.* (noting that the customs inspector's routine questioning of the defendant, who was not in custody or subject to a coercive atmosphere, "did not transform that routine administrative procedure into a custodial interrogation"). Additionally, the court recognizes that there is a "booking exception" to *Miranda*; "*Miranda* warnings are not required before the asking of routine booking questions to gather background biographical information." [*United States v. Reyes*, 908 F.2d 281, 292-93 (8th Cir.1990) (citing *Pennsylvania v. Muniz,* 496 U.S. 582, 601-02 (1990)).  However, as stated above, this is a case involving more than mere "routine" questioning by the ICE agents.  *See id.* (explaining that the booking exception does not apply where the "questions are reasonably likely to elicit an incriminating response in a particular situation").

> *Miranda's* requirement applies to all custodial interrogations where criminal prosecutions could result, even if the interrogation is administrative in nature. *See Mathis v. United States*, 391 U.S. 1, 4 (1968) (requiring *Miranda* warnings before routine tax investigations by IRS agent of inmate in state jail on unrelated charges because such investigations "frequently"

-21-

lead to criminal prosecutions). I*n United States v. Layne*, 973 F.2d 1417 (8th Cir. 1992), for example, a customs inspector conducted an interview of an individual who was not in custody.  *Id*. at 1421.  The questions were administrative in nature.  *Id*.  As soon as the customs inspector had probable cause to believe that the interviewee was intentionally providing false statements, thereby committing a criminal violation, the inspector gave the interviewee *Miranda* warnings.  *Id*.  Once the inspector could foresee the possibility that the interviewee's responses to questions could be used against her to initiate criminal proceedings, and not simply for customs processing, he warned the interviewee of her rights under *Miranda*.  *Id*.

*United States v. Torres-Lona*, 2006 WL 3254538 at *11, Case No. 06-CR-72 (N.D. Iowa, Nov. 9, 2006), *aff'd*, 491 F.3d 750 (8th Cir. 2007), *cert. denied*, 128 S. Ct. 927 (2008).

In *United States v. Bonilla-Siciliano*, 2008 WL 1820828 at *5, the court observed,

Although the government in similar cases has argued that the questioning of aliens about their immigration status is akin to "routine booking information," this argument has been rejected by the courts. For instance, in *United States v. Aguin-Guerra*, 2004 WL 1875050 (N.D. Iowa Aug. 20, 2004), an alien argued that "his statements to ICE agents that he was a citizen of Guatemala and was in the United States illegally should be suppressed because he was not advised of his *Miranda* rights prior to questioning." *Id*. at *2. The government argued that the questions fell within the "routine booking" exception recognized by the Eighth Circuit.  The court disagreed:

The flaw in the Government's argument here is that the ICE agents who interviewed [the alien] were not engaged in "routine booking" of [the alien] when they interviewed him.... [The alien] had been booked the day before by the Woodbury County Sheriff's office.  Instead, the ICE agents were interviewing [the alien] to determine, at least in part, whether criminal charges against him were warranted.

*Id.* at *3.

In *United States v. Richmond*, 2006 WL 3327674, Case No. 1:05CR501 (N.D.N.Y., Nov. 15, 2006), the defendant was interviewed by immigration officers on May 27, 2005 and June 1, 2005 at a correctional facility where he was serving an unrelated state sentence.  The first interview was conducted to determine alienage and deportability, and

-22-

the defendant told the officer he was born in Brooklyn, New York.  The officer was suspicious of this statement and forwarded the file to another agent, who discovered that the defendant had entered the United States as a non-immigrant visitor and was a citizen of Trinidad and Tobago.  This point was pursued during the second interview, but the defendant was not Mirandized.  The defendant was charged in federal court with two counts of falsely representing himself to be a citizen of the United States to a U.S. Immigration Inspector.  In ruling on the defendant's motions to suppress statements, the court determined that the agent who conducted the first interview was not required to provide *Miranda* warnings because the agent, at the time of the interview, was not aware of the potential incriminating nature of the disclosures that he sought, i.e., place of birth.  The statements made during the second interview, however, were suppressed:  "SA Polouski knew or should have known that, if Defendant continued to claim that he was a United States citizen, his statements could be used to support criminal charges against him."  *United States v. Richmond*, 2006 WL 3327674 at *4.

The question presented here is whether Trinidad Villa-Gonzalez was "interrogated" by DO Becker at the Platte County jail.  Becker merely conducted an administrative inquiry when he interviewed Trinidad over the telephone; however, the questioning at the Platte County jail was something more.  After the telephone interview, Becker did further research and determined that Trinidad had an adverse immigration record under a substantially different date of birth.  Becker could find no record that Trinidad entered the country with a passport or visa as he claimed.  While Becker may not have expected Trinidad to actually admit that he had entered the country using false documents, Becker did ask

about the visa and passport suspecting that Trinidad had entered the country illegally.  The court also notes that DO Becker was summoned to Columbus by an officer of the Nebraska State Patrol and was aware of the general nature (if not the details) of the State Patrol's interest in the defendants by the time he began the interviews.

Considering the totality of the circumstances, the court finds that DO Becker had reason to suspect that his questions about the passport and visa were likely to elicit incriminating responses.   Becker, therefore, did conduct a custodial interrogation of Trinidad Villa-Gonzalez at the jail.  Because Trinidad was not given his *Miranda* rights prior to the interrogation, his statements made to Becker at the Platte County jail must be suppressed in this criminal proceeding.

### E.  Fruit of the Poisonous Tree

Trinidad's non-Mirandized admission that he had entered the country using false documents led to the issuance of the search warrant for the defendants' trailer.  "According to the 'fruit of the poisonous tree' doctrine, evidence that is obtained by the illegal actions of law enforcement officers must be suppressed."  *United States v. Torres-Lona*, 2006 WL 3254538 at *12 (citing *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963)).  That doctrine, however, does not apply in this instance.

In *United States v. Patane*, 542 U.S. 630, 636 (2004), the Supreme Court explained that "the *Miranda* rule is a prophylactic employed to protect against violations of the Self-Incrimination Clause."  "[T]he core protection afforded by the Self-Incrimination Clause is a prohibition on compelling a criminal defendant to testify against himself at trial....  The

Clause cannot be violated by the introduction of nontestimonial evidence obtained as a result of voluntary statements. *United States v. Patane*, 542 U.S. at 638.

The ruling in *Patane* applies only to statements that were voluntarily made. To determine whether Trinidad's statement to DO Becker was voluntarily made, the court must consider the totality of the circumstances and determine whether Trinidad's will was overborne. *United States v. Syslo*, 303 F.3d 860, 866 (8th Cir. 2002). The court must examine both "'the conduct of the law enforcement officials and the capacity of the suspect to resist pressure to confess.'" *Id.* (quoting *United States v. McClinton*, 982 F.2d 278, 282 (8th Cir. 1992)).

> To state the obvious, "interrogation of a suspect will involve some pressure because its purpose is to elicit a confession." ... [T]he fact that the tactics produced the intended result ... does not make [a] confession involuntary." ... In other words, "there is nothing inherently wrong with efforts to create a favorable climate for confession." ... "'[Q]uestioning tactics such as a raised voice, deception, or a sympathetic attitude on the part of the interrogator will not render a confession involuntary unless the overall impact of the interrogation caused the defendant's will to be overborne.'" ... Nor will a promise of leniency, an "expressed disbelief in the statements of a suspect ..., or lie[s] to the accused about the evidence against him" necessarily render a confession involuntary.... Rather, the coercive conduct must be "such that the defendant's will was overborne and his capacity for self-determination critically impaired."

*United States v. Santos-Garcia*, 313 F.3d 1073, 1079 (8th Cir. 2002) (citations omitted); *United States v. Dehghani*, — F.3d —, 2008 WL 5273966 at *2, Case No. 08-1518 (8th Cir., Dec 22, 2008).

The record in this case is devoid of any indication that either Trinidad or Jose were particularly susceptible to pressure that may have been asserted by law enforcement. The

-25-

evidence does not suggest that their wills were overborne at any time during these events, and the ruling in *Patane* applies in this instance.

Using statements to obtain a search warrant does not compel the defendant to testify against himself at trial; therefore, under *Patane*, the *Miranda* violation does not require the suppression of evidence found pursuant to the warrant. *See, e.g., United States v. Knill*, 2007 WL 1892560 at *5 n.17, Case No. 07-0029, (M.D. Pa., June 29, 2007); *United States v. Phillips*, 468 F.3d 1264, 1265 (10th Cir. 2006), *cert. denied*, 127 S. Ct. 1893 (2007);  *United States v. Lara-Garcia*, 478 F.3d 1231 (10th Cir.), *cert. denied*, 127 S. Ct. 2281 (2007).

### F.  Validity of the Search Warrant

Having determined that the un-Mirandized statements of Trinidad need not be excised from the search warrant application, the court turns to the question of whether there was probable cause to issue the warrant.

> "If an affidavit in support of a search warrant sets forth sufficient facts to lead a prudent person to believe that there is a fair probability that contraband or evidence of a crime will be found in a particular place, probable cause to issue the warrant has been established." [*United States v. Grant*, 490 F.3d 627, 631 (8th Cir. 2007), *cert. denied*,--- U.S. ----, 128 S.Ct. 1704, 170 L.Ed.2d 516 (2008)], *citing Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (internal quotation marks omitted).  "Whether probable cause to issue a search warrant has been established is determined by considering the totality of the circumstances, and resolution of the question by an issuing judge should be paid great deference by reviewing courts." *Grant,* 490 F.3d at 632.... The affidavit for a search warrant should be examined using a common sense approach, and not a hypertechnical one. *Grant,* 490 F.3d at 632.

*United States v. Hudspeth*, 525 F.3d 667, 674 (8th Cir. 2008).

The search warrant (Ex. 4) was issued by the undersigned.  I once again find that the supporting affidavit sets forth sufficient facts to show a fair probability that evidence of a  federal crime involving "fraud and misuse of visa, permits and other documents," would be found in the defendants' trailer.

The Application and Affidavit for Search Warrant incorporates the affidavit of Greg Jensen.  The required signatures of the affiant and the undersigned are located at the conclusion of the affidavit.  The search warrant, which also incorporates the affidavit of Greg Jensen, describes with particularity the premises to be searched and (as quoted above) the items to be seized.

In the alternative, the court finds that the good faith exception of *United States v. Leon*, 468 U.S. 897 (1984), applies to this search warrant.  In *Leon*, the Supreme Court recognized that "the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates." *Id.* at 916.

> Under the good-faith exception, evidence seized pursuant to a search warrant that lacked probable cause is admissible if the executing officer's good-faith reliance on the warrant is objectively reasonable.  [*United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007)].  "The good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the [issuing judge's] authorization." *Id.* (internal quotation omitted) (alteration in original).  "When assessing the objective [reasonableness] of police officers executing a warrant, we must look to the totality of the circumstances, including any information known to the officers but not presented to the issuing judge." *Id.* at 431 (quotation omitted) (alteration in original).

*United States v. Perry*, 531 F.3d 662, 665 (8th Cir. 2008).  Should  the district court find that the affidavit in this case did not establish probable cause for the issuance of the

search warrant, the evidence is nevertheless admissible under the good faith exception of *Leon*.

### G. Execution of the Search Warrant

Investigator Bignell assisted in executing the search warrant. He had previously received information from a proffer that methamphetamine was hidden above a ceiling fixture in the kitchen. He searched that location, where he found methamphetamine, handguns, and a large amount of currency.

"Police may validly seize incriminating evidence found while executing a warrant to search for other items." *United States v. Tagbering*, 985 F.2d 946, 951 (8th Cir. 1993). Police officers executing a search warrant may seize the items described in the warrant, and may also seize other items of evidence, contraband or instrumentalities of a crime "if discovered during the reasonable course of the search." *United States v. Robinson*, 2008 WL 4790324 at *5, Case No. 08-386 (E.D. Mo., Oct 29, 2008). "The discovery of such other items need not be 'inadvertent.'" *Id.* (citing *Horton v. California*, 496 U.S. 128, 110 S.Ct. 2301, 2308-11 (1990)).

Investigator Bignell, with the benefit of information given during a proffer, may have searched the kitchen ceiling fixture hoping to find evidence relevant to his drug investigation. The kitchen ceiling fixture itself was of interest because it appeared to be out of place, he could not find any switch to operate it, and other light fixtures in the trailer had been removed or replaced. (52:6-18). The fact remains that Bignell searched in that location during the reasonable course of the search for evidence of immigration law violations in a location where items such as those listed in the warrant were likely to be

-28-

hidden.  He did not exceed the original scope of the search warrant.  Consequently, the seizure of the methamphetamine, currency, and handguns from the kitchen ceiling fixture was permissible.

### H.  Interrogations conducted on May 30, 2008

Investigator Bignell interrogated both of the defendants on May 30, 2008.  The audio recordings (Exs. 2 & 3) of the interviews indicate that Bignell did advise the defendants of their *Miranda* rights.

### 1.  Jose Villa-Gonzalez

There is no clear indication that Jose Villa-Gonzalez waived his *Miranda* rights. Bignell's testimony on this point is as follows:

> Q.  [by counsel for Jose Villa-Gonzalez]  Okay.  When you advised [Jose] of his Miranda rights, the last thing you need to do is obtain a waiver of those rights prior to questioning; isn't that true?
> A.  [Investigator Bignell]  What – what'd you mean?  Are you asking me if he under- – if he indicated he understood his rights?
> Q.  No.  When you question a suspect, you advise them of what their rights are initially, correct?  You have the right to remain silent, I'm a police officer, all those sorts of things –
> A.  Okay, yes.
> Q.  – right?  And then after they – you determine if they understand their rights, then you ask them the question are you willing to give up those rights and speak to me now without an attorney present?
> I – I don't think I stated it in that manner.  I mean, I can read you what I – or it's on the audio.  I can read you exactly what I informed him. I have the card with me.
> Q.  Okay.  What I'm getting at is he never voluntarily waived his right – his Miranda rights, did he?
> A.  He said he understood his rights.
> Q.  Right.  But he never waived them?
> A.  I – I guess I'm kind of confused here as to what – what you're asking me, what -- what you mean by waive.

> Q. Where he would tell you that he understands all of his rights and he's – he's understanding those rights, he's willing to speak with you without the presence of an attorney.
>
> A. I asked him if he understood his rights and he indicated to the interpreter that he did at which time he was questioned.
>
> Q. All right. But you never specifically obtained a waiver of those rights from him?
>
> A. I – I – I again don't – don't quite understand. If – if he said he understood his rights, I'm understanding that to mean that he waived his rights because I had already told him what his rights were.
>
> Q. Okay. At any rate, it'll be reflected in the – in the audio recording, correct?
>
> A. Yes.

(37:10-38:22).

The court has listened to the recording of Jose Villa-Gonzalez' interview. Jose did tell the interpreter he understood his rights; however, Bignell did not ask Jose if Jose would agree to speak to him without an attorney present. The government bears the burden of showing the admissibility of the statement, i.e., that the defendant waived his *Miranda* rights and made a free and voluntary statement. *See United States v. Flores-Sandoval, 422 F.3d at 714*. The court finds that the government has not met its burden of showing that Jose actually waived his *Miranda* rights.

That said, the court finds that Jose's statements were not forced or coerced in that overall impact of this interrogation did not cause his will to be overborne. *See, e.g., United States v. Dehghani, 2008 WL 5273966* at *2-3.

### 2. Trinidad Villa-Gonzalez

The court has listened to the audio recording of Trinidad Villa-Gonzalez' interview. The recording demonstrates that Investigator Bignell advised Trinidad of his *Miranda* rights. Trinidad said he understood each of his rights and asked when an attorney would be

appointed.  Bignell answered the question truthfully and did ask Trinidad if he would agree to be interviewed without an attorney present.  Trinidad responded to the effect that he would answer some of Bignell's questions.

The court finds that the government has met its burden of proving that Trinidad voluntarily waived his *Miranda* rights prior to being interviewed by Investigator Bignell on May 30, 2008.

**CONCLUSION**

In summary, the defendants were not "in custody" until they were placed under administrative arrest after talking to DO Becker on the telephone.  Although Investigator Bignell entered the trailer without permission in order to hand the telephone to Jose Villa-Gonzalez, Jose's statements to DO Becker were not coerced.

DO Becker had reason to suspect that his questions to Trinidad about the passport and visa were likely to elicit incriminating responses.  Becker did conduct a custodial interrogation of Trinidad Villa-Gonzalez at the Platte County jail without reading Trinidad his *Miranda* rights.  These statements should be suppressed due to the *Miranda* violation; however, *United States v. Patane* permits the use of such statements in an application for a search warrant.

There was probable cause to issue a search warrant authorizing law enforcement to search the defendants' trailer for evidence of immigration law violations, and the officers' reliance on the search warrant was objectively reasonable.  The officers did not exceed the scope of the search warrant, as the methamphetamine, handguns, and currency were found in a location where items such as those listed in the warrant were likely to be hidden.

-31-

Jose Villa-Gonzalez did not waive his *Miranda* rights prior to being interviewed by Investigator Bignell on May 30, 2008.  Although the statements he made during that interview were not the product of coercion, they should be suppressed due to the *Miranda* violation. Trinidad Villa-Gonzalez was asked to, and did, waive his *Miranda* rights prior to questioning by Investigator Bignell on May 30, 2008.

**RECOMMENDATION**

For all these reasons,

**IT IS RECOMMENDED:**

1.  That the Motion to Suppress (#26) filed by defendant Trinidad Villa-Gonzalez be granted as to the statements made by him to Deportation Officer Becker at the Platte County jail on May 29, 2008, and denied in all other respects;

2.  That the Motion to Suppress Evidence (#28) filed by defendant Jose Manuel Villa-Gonzalez be denied; and

3.  That the Motion to Suppress Statements (#29) filed by defendant Jose Manuel Villa-Gonzalez be granted as to the statements made by him to Investigator Bignell on May 30, 2008 and denied as to all other statements.

Pursuant to NECrimR 57.3, a party may object to this Report and Recommendation  by filing an "Objection to Report and Recommendation" within ten (10) business days after being served with the recommendation. The statement of objection shall specify those portions of the recommendation to which the party objects and the basis of the objection. The objecting party shall file contemporaneously with the statement of objection a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.

**DATED January 6, 2009.**

**BY THE COURT:**

**s/ F.A. Gossett**
**United States Magistrate Judge**