IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 8:08CR242 |
| | ) | |
| v. | ) | |
| | ) | |
| TRINIDAD VILLA-GONZALEZ and | ) | MEMORANDUM AND ORDER |
| JOSE MANUEL VILLA-GONZALEZ, | ) | |
| | ) | |
| Defendants. | ) | |
| —————————————————— | ) | |

This matter is before the court on the defendants' objections, Filing Nos. 45 and 47, to the report and recommendation ("R&R") of the magistrate judge, Filing No. 44, on the defendants' motions to suppress statements and evidence, Filing Nos. 26, 28 and 29. Both defendants are charged in a superseding indictment with conspiracy to distribute and possess with intent to distribute methamphetamine in violation of 21 U.S.C. §§ 846 and 841 and  being aliens in possession of a firearm, in violation of 18 U.S.C. § 922(g)(5), and defendant Trinidad is also charged with reentry after deportation after a conviction of an aggravated felony, in violation of 8 U.S.C. § 1326(a) &(b)(2).  Filing No. 31, Superseding indictment.

Under 28 U.S.C. § 636(b)(1)(C), the court makes a de novo determination of those portions of the report and recommendations to which the parties object. *United States v. Lothridge*, 324 F. 3d 599, 600-01 (8th Cir. 2003).  The court has conducted a de novo review of the record and exhibits, including the transcript of the suppression hearing and audiotapes of the interviews at issue.  Filing No. 43, Hearing Transcript ("Hr'g Tr."); Filing No. 38, Exhibit List.  The court generally agrees with the magistrate judge's recitation of the

facts, with certain additional findings noted below, but finds error in the magistrate judge's application of the law to the facts. The court will adopt the magistrate judge's recommendation to grant the defendants' motions to suppress the statements made by Jose Villa-Gonzalez to Investigator Bignell on May 30, 2008, and the statements made by defendant Trinidad Villa-Gonzalez to ICE Officer Becker on May 29, 2008, but sustains the defendants' objections to the magistrate judge's recommendation to deny the motions in other respects.

I.   BACKGROUND

A.   Facts

The facts set forth in the R&R need not be repeated in their entirety. The evidence adduced at the evidentiary hearing establishes that Jose Villa-Gonzalez and Trinidad Villa-Gonzalez were in their home when law enforcement officers initiated a consensual contact, or "knock and talk," at their trailer home, having been informed through a proffer in another case of drug-trafficking activity at the trailer. Hr'g Tr. at 10, 81-82. While doing a random "drive-through" of the trailer park, Nebraska State Patrol Investigator Keith Bignell, accompanied by Columbus Nebraska Police Department Investigator Doug Molczyk, both assigned to a joint drug-interdiction task force, noticed people and a vehicle outside the trailer they had been watching because of the proffer information. *Id.* at 9, 43-45. Bignell called the Nebraska State Patrol for assistance with a "consensual contact" at the trailer. *Id.* at 10. Bignell was wearing jeans and a vest with the word "police" on the front and back and his weapon was visible, and Molczyk was in plainclothes. *Id.* at 10, 29. Nebraska State Patrol trooper Dan Hicks arrived in a squad car, wearing a uniform. *Id.* at 10, 29. Bignell stated that they needed assistance for safety and for access to a police radio. *Id.* at 30.

2

The officers approached a man later identified as Esau Valenzuela-Machado and asked him for identification. *Id.* at 11. He produced a Mexican voter registration card. *Id.* Valenzuela-Machado was escorted to the patrol car. *Id.* at 12. Bignell and Molczyk went to the door of the trailer and knocked. *Id.* at 10-11. Defendant Jose Villa-Gonzalez answered the door and Bignell asked him for identification. *Id.* at 12. Bignell also asked if he could come in the trailer. *Id.* Jose Villa-Gonzalez responded "no." *Id.* Jose produced a Washington driver's license as identification. *Id.* at 14. Trinidad Villa-Gonzalez then came to the door. *Id.* Investigator Bignell testified that he recognized Trinidad Villa-Gonzalez and knew who he was. *Id.* Trinidad Villa-Gonzalez produced a Nebraska state identification card. *Id.* at 13. Investigator Bignell spoke English and testified that Trinidad Villa-Gonzalez appeared to understand English. *Id.* at 13. Bignell asked him if he owned the trailer and he answered "yes." *Id.* at 13. He asked who else lived there and Trinidad stated that his brother, Jose, also lived there. *Id.* at 14. Bignell asked Trinidad where he was born and he answered "Mexico." *Id.* Bignell then told Trinidad that he suspected the two brothers were drug dealers and asked for permission to search the trailer. *Id.* Trinidad expressly denied consent to search the trailer. *Id.*

Bignell testified that at that point in the encounter he had no reason to believe the defendants were in the United States illegally. *Id.* at 33. Bignell did not tell the defendants that they did not have to answer the questions or that they were free to ask the officers to leave. *Id.* at 35.

After the defendants refused to allow the officers to search the home, Investigator Bignell returned to his vehicle to call Immigration and Customs Enforcement ("ICE") Deportation Officer Michael Becker to "run checks on all three through immigration." *Id.*

at 14.  Bignell testified that he told Becker the drug-trafficking information at that time, but that Becker was aware that Bignell was a drug investigator.  *Id.*   Becker returned Bignell's call once he had access to a computer to run the checks and Bignell related the names and dates of birth of the three men to Becker.  *Id.* at 14-15.  Becker then stated that he needed to talk to the men on the cell phone.  *Id.* at 16.  After talking to Trinidad, Becker told Investigator Bignell to place Trinidad under administrative arrest.  *Id.*  Bignell testified he had no other reason to arrest Trinidad.  *Id.* at 34.  A similar process occurred with respect to Valenzuela-Machado.  *Id.* at 17.

Becker testified he next approached the trailer, opened the door, walked inside and handed the phone to Jose Villa-Gonzalez to talk to Officer Becker.  *Id.* at 16.  After a conversation between Jose Villa-Gonzalez and Becker in Spanish, Becker told Bignell to place Jose Villa-Gonzalez under administrative arrest.  *Id.* at 18.  The defendants were handcuffed and transported in two Nebraska State Patrol cruisers to the Platte County Detention Center.  *Id.*  Bignell testified that he remained at the trailer for 35 to 40 minutes waiting for a drug dog.  *Id.* at 18, 35.  He did not conduct a sniff with the dog because the officers had locked themselves out of the trailer.  *Id.* at 35.  Bignell then drove to the Platte County jail, where he spoke to ICE Officer Becker, who had traveled from Omaha and had interviewed Trinidad Villa-Gonzalez.  *Id.* at 19.  Bignell testified that Becker stated that he was sure Trinidad had been deported before and was going to get a warrant.  *Id.* at 19.  Bignell then returned to the trailer park, where he waited until 6:00 p.m. for the warrant, and then helped Officer Becker, Investigator Molczyk, and two other ICE officers execute the warrant.  *Id.* at 20.  Law enforcement officers searched the house and found drugs, money and a gun concealed above the light fixture in the kitchen.  *Id.* at 50-51, 55.  Bignell

testified that the proffer statement that implicated the defendants had included the information that drugs were kept above a light fixture. *Id.* at 55.

Bignell also testified that he and Investigator Molczyk returned to the Platte County jail on May 30, 2009, with an interpreter, to interview all three men. *Id.* at 21. He first interviewed Trinidad. Bignell testified that he read Trinidad his *Miranda* rights. The audiotape of the interview shows that Trinidad Villa-Gonzalez was informed of his rights and asked for a lawyer, stating, "When does the lawyer come?" He did not clearly and unequivocally waive his right to have a lawyer present for the interview. Although he answered Investigator Bignell's questions, he again asked, "When is my lawyer coming?" at the close of the interview.[1]

ICE Deportation Officer Becker also testified at the hearing. *Id.* at 56-87. He explained that he was a deportation officer and not a special agent and that the difference is that deportation officers handle administrative removals and special agents do criminal investigative work. *Id.* at 57. He stated that in his computer records search, "only one of the individuals hit as a possible previous immigration contact"—Jose Villa-Gonzalez. *Id.* at 58-60, 90. He could not tell the nature of the immigration contact at the time. *Id.* at 60, 91. When he spoke on the phone to Jose Villa-Gonzalez, he did not know the nature of the contact. *Id.* at 91. He stated he checked computer records that show immigration contacts as well as Treasury lists of nonimmigration entries into the United States and the

---

[1]A long pause followed this statement. Investigator Bignell's response implied that a lawyer would be furnished when it was convenient for the court and Trinidad Villa-Gonzalez expressed a need for a Spanish-speaking lawyer or a lawyer and an interpreter for a hearing on the following Monday. The officer assured Trinidad Villa-Gonzalez that a lawyer would be present for the hearing. In the context of the entire colloquy, it is clear to the court that Trinidad Villa-Gonzalez made a request for an attorney. Trinidad Villa-Gonzalez then agreed, conditionally, to talk to the officer and proceeded to answer questions. The query about the lawyer at the end of the conversation reinforces the finding that Trinidad Villa-Gonzalez had asked for counsel.

absence of records on those databases would indicate that a foreign national was in the country illegally. *Id.* at 60, 90.

He also stated that before he spoke on the phone to the three individuals, he had been told that the Nebraska State Patrol officers were conducting a drug investigation of the three individuals and knew that the law enforcement officers were conducting a "knock and talk" at the defendants' trailer home. *Id.* at 81. He explained that a "knock and talk" is "[w]here you knock on the door and say, look, you know, we understand you're selling drugs, you know, we'd like to come in and talk to you, you know, can you show us around . . . it's how they get access." *Id.* at 82. Becker described his role as "basically being their cleanup guy. I was going to take custody of aliens that they thought was slinging dope up in Columbus and—and—and get them out of the picture is basically the intent." *Id.* While en route to the Platte County jail, Becker learned that Jose Villa-Gonzalez's prior contact with immigration was that he had once tried to enter the country and had been allowed to withdraw his application for entry. *Id.* at 89.

After the phone contact, Becker traveled from Omaha to the Platte County detention facility to speak to the defendants. *Id.* at 65. He interviewed all three defendants and testified that he never *Mirandized* anyone. *Id.* at 76. He interviewed Trinidad Villa-Gonzalez first and asked if he'd ever been deported before. *Id.* at 67. Becker testified that a positive response to that query would indicate that the interviewee had committed a felony crime and Becker stated that he would ordinarily provide a *Miranda* warning to an interviewee at that point. *Id.* Becker testified that he was not aware of any other criminal activity at the time he interviewed Trinidad at the jail. *Id.* at 67-68. Early in the conversation, Trinidad admitted to entering the country with a passport and visa that belonged to someone else. *Id.* at 69. At that point, Becker stopped the interview and gave

6

Trinidad an ICE "counselor notification form and request for disposition."[2]  *See* Filing No. 38, Exhibit List,  Hr'g Ex. 1, Form I-826.

Becker then left the interview room and told Investigator Molczyk that "I'll bet dollars to pesos that this guy's got those documents somewhere hidden in his house because aliens don't—they don't give up stuff like that."  *Id*. at 72.  Becker also testified that it was only necessary to search for documents with respect to defendant Trinidad Villa-Gonzalez's immigration status because possession of the documents in Nebraska would constitute a crime.  *Id*. at 76.  Becker later testified that in the earlier phone conversation, Trinidad had stated that he had his documents in the trailer, but Becker did not ask to see them at that time.  *Id.* at 76-77.

Becker called the United States Attorney and decided to apply for a search warrant[3].  *Id.*  The application for the warrant was based on Trinidad Villa-Gonzalez's unwarned statement to ICE Officer Becker that he entered the country with someone else's immigration documents.  Filing No. 38, Exhibit List, Ex. 4, Affidavit and Warrant.  It was prepared by Becker's boss, Greg Jensen, and presented to a magistrate judge in Omaha by Jensen.  *Id.* at 73-76.

Nebraska State Patrol Trooper Dain Hicks also testified at the hearing.  He testified to essentially the same set of facts as Officer Bignell.  *Id.* at 96-103.  He added that Esau

---

[2]This document entitled "Notice of Rights and Request for Disposition" notifies an alien of certain rights that they have in a deportation proceeding and allows them to elect to voluntary return to their country of origin.  It does not inform them of *Miranda* rights.

[3]Asked why he did not obtain a warrant to search for drugs, Investigator Bignell testified that "[i]t seemed silly to get two search warrants" because he was "going to be able to gain access and . . . going to be able to search for drugs" with Officer Becker's search warrant.  Filing No. 43, Hr'g Tr. at 50.  He further testified that at that point he did not have probable cause or reason to get a search warrant for drugs.  *Id.*  He stated he believed he could not get a search warrant based on the proffer information because that information was stale since it had been three months since the proffer.  *Id.* at 51.  He admitted he had no other drug information at that time.  *Id.*

Valenzuela-Machado had been placed in the squad car at law enforcement request.  *Id.* at 97, 99-100.  He further stated that Valenzuela-Machado remained in the "cage" of the patrol car while the officers entered the trailer and he was not free to leave.  *Id.* at 100.  He testified that none of the men were free to leave and that he would have stopped anyone who tried.  *Id.* at 99-100.  He testified that he and Investigator Bignell went inside the trailer. *Id.* at 101.  Although he recalled that Bignell held the phone to Jose Villa-Gonzalez's ear, he stated Jose Villa-Gonzalez was not handcuffed until after Investigator Bignell had placed him under arrest.  *Id.* at 98, 102.  Trooper Hicks understood that Jose Villa-Gonzalez had admitted that he was illegally present in the United States while on the phone with Becker.  *Id.* at 126.

Jose Villa-Gonzalez also testified, through an interpreter, at the hearing.  *Id.* at 106-109.  He testified that he remained in the trailer while the officers were outside talking to his brother.  *Id.* at 108.  He looked out window and saw his brother being handcuffed and arrested.  *Id.*  He stated that the officers entered the trailer and said "Jose, you have been arrested and turned [him] around and also handcuffed [him]."  *Id.*  Jose Villa-Gonzalez testified that he was handcuffed at the time he was told to speak on the phone to Becker. *Id.* at 108-109.

B.  Motion to Suppress

Both defendants moved to suppress the statements made to ICE Officer Mike Becker over the phone and the statements made to ICE Officer Beck and State Patrol Investigator Bignell at the Columbus police station, as well as the evidence found in the search of the trailer.  The defendants' motions to suppress were based on alleged violations of both the Fourth and Fifth Amendments.  Filing Nos. 27, Trinidad Villa-Gonzalez's Brief; Filing No. 30, Jose Villa-Gonzalez's Brief.  The defendants argued that

8

they were illegally seized and were questioned without *Miranda* warnings and defendant Trinidad asserted that he was questioned without an attorney present after he had requested one.

The magistrate judge found that the initial contact with the defendants was an "attempt to obtain information from the defendants through consensual conversation, which is a reasonable investigative technique as long as the encounter does not become coercive."  Filing No. 44, R&R at 15.  Addressing the question of whether the defendants' liberty was restrained in such a way that the defendants would not have felt free to leave, the magistrate judge noted that, up to the point that Trinidad Villa-Gonzalez refused consent to search the trailer, "the record does not suggest that Trinidad and Jose were coerced into talking to the police or that they were susceptible to any pressure that may have been asserted by the officers."  *Id.* at 15.  The magistrate judge acknowledged the defendants affirmatively refused to allow the officers into the house.  *Id.* at 16.  With respect to the telephone conversations with ICE Officer Becker, the magistrate judge found "no evidence that Trinidad objected to talking to Becker on the telephone or that he was forced to do so."  *Id.* at 17.  The magistrate judge characterized the telephone interview as a mere "administrative inquiry."  *Id.* at 23.  With respect to Jose Villa-Gonzalez, the magistrate judge credited the law enforcement officer's testimony that Jose was not in handcuffs during the conversation.  *Id.* at 17.  Although he acknowledged that it was "disturbing that Bignell entered the trailer without permission in order to present the telephone to Jose," the magistrate judge found that "[e]ven assuming that Bignell acted improperly by entering the trailer without permission, there is no credible evidence that Jose objected to talking to Becker on the telephone or that he was forced to do so."  *Id.* Finding that neither Trinidad nor Jose Villa-Gonzalez was "in custody" when they talked to

Becker on the telephone, the magistrate judge concluded that *Miranda* warnings were not required. *Id.* at 18-19. He further found that the officers had reasonable suspicion that the defendants were in the country illegally and could detain them for further investigation. *Id.* at 20.

The magistrate judge found that Trinidad Villa-Gonzalez was "unquestionably in custody," when he was interviewed at the jail. *Id.* The magistrate judge fond that Becker conducted the interview suspecting the defendant had entered the country illegally and at the time of the interview he was aware of the general nature of the Nebraska State Patrol's interest in the defendants as drug distributors. *Id.* at 23-24. He concluded that the questioning at the Platte County jail amounted to more than an administrative inquiry, since Becker asked questions that were reasonably likely to elicit an incriminating response. *Id.* Noting that "while [8 U.S.C.] § 1357(a) authorizes immigration officers to stop, detain, and question suspects, it does not obviate the need for *Miranda* warnings where they are otherwise required," the magistrate judge concluded that ICE Officer Becker's conversation with Trinidad Villa-Gonzalez at the Platte County jail on May 29, 2008, was a custodial interrogation and found that "[b]ecause Trinidad was not given his *Miranda* rights prior to the interrogation, his statements made to Becker at the Platte County jail must be suppressed in this criminal proceeding." *Id.* at 20-21.

However, because the magistrate judge found a violation of the Fifth Amendment, he found that the illegality did not necessitate suppression of the physical fruits of the search that was based on the information obtained as a result of the unwarned statement. *Id.* at 25-26. He relied on *United States v. Patane*, 542 U.S. 630, 636 (2004) (plurality opinion), in support of this conclusion. Based on the finding that the information gleaned from the unwarned interview of Trinidad Villa-Gonzalez should not be excised from the

warrant, the magistrate judge found that the application amounted to probable cause to issue the search warrant.  *Id.* at 26

Defendant Jose Villa-Gonzalez contends that the magistrate judge erred in finding "that the Defendants' freedom of movement was not restricted to a degree akin to a formal arrest, and neither Trinidad nor Jose Villa-Gonzalez were 'in custody' when they talked to Officer Becker on the telephone," and in failing to find that the law enforcement officers' unlawful entry into the defendants' trailer was a violation of the Fourth Amendment that requires suppression of his resultant statement and the fruits of the subsequent search.  He further argues that the magistrate judge erred in finding that "the officers had reasonable suspicion that the Defendants had violated immigration laws and were allowed to detain them for further investigation" and also challenges the validity of the search warrant. Defendant Trinidad Villa-Gonzalez challenges the determination that the evidence subsequently obtained in the search of the trailer does not constitute 'fruit of the poisonous tree' and need not be suppressed at trial.

II.   DISCUSSION

A.   The Fifth Amendment

*Miranda* warnings must be given any time a suspect is in custody and is subject to interrogation by law enforcement officials.  *See Miranda v. Arizona*, 384 U.S. 436, 484 (1966).  *Miranda* protects the constitutional privilege against self-incrimination by creating a presumption of coercion, and thus inadmissibility, for statements made during custodial interrogations in the absence of warnings.  *United States v. Patane*, 542 U.S. at 639. "*Miranda* defines custodial interrogation as 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" *United States v. Hogan*, 539 F.3d 916, 922 (8th Cir. 2008) (*quoting*

*Miranda,* 384 U.S. at 444).  Courts consider six nonexclusive factors to determine whether an individual is in custody for the purposes of *Miranda*:  (1) whether the suspect was informed that he or she was free to leave and that answering was voluntary; (2) whether the suspect possessed freedom of movement; (3) whether the suspect initiated contact or voluntarily acquiesced; (4) whether strong-arm tactics or strategies were employed; (5) whether the atmosphere was police-dominated; and (6) whether the suspect was placed under arrest at the end of questioning.  *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990).  Interrogation refers not only to express questioning but also to any words or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response from the suspect.  *Hogan*, 539 F.3d at 922.

*Miranda* warnings are described "as a 'prophylactic rule,' and as a 'procedural safeguard,' employed to protect Fifth Amendment rights against 'the compulsion inherent in custodial surroundings.'"  *Brown v. Illinois*, 422 U.S. at 590, 600 (1975) (quotations omitted).  The rule serves the Fifth Amendment and sweeps more broadly than the Fifth Amendment itself.  *Oregon v. Elstad*, 470 U.S. 298, 306-307 (1985).  Consequently, an unwarned statement that is otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under *Miranda*.  *Id.*  The booking exception "exempts from Miranda 's coverage questions to secure the biographical data necessary to complete booking or pretrial services."  *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990).

B.   The Fourth Amendment

1.  Seizure

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  "The simple language of the Amendment applies equally to seizures of

12

persons and to seizures of property." *Payton v. New York*, 445 U.S. 573, 584 (1980).  It applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest.  *United States v. Brignoni-Ponce* 422 U.S. 873, 878 (1975); *Davis v. Mississippi*, 394 U.S. 721 (1969); *Terry v. Ohio*, 392 U.S. 1, 16-19 (1968) (stating "Whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person, and the Fourth Amendment requires that the seizure be 'reasonable.'").  As with other categories of police action subject to Fourth Amendment constraints, the reasonableness of such seizures depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.  *Terry*, 392 U.S. at 20-21.

Encounters between the police and citizens fall into three general categories:  (1) consensual or voluntary encounters, which are not seizures and do not implicate the Fourth Amendment; (2) investigative detentions, which are seizures of limited scope and duration within the meaning of the Fourth Amendment and must be supported by a reasonable articulable suspicion of criminal activity; and (3) physical arrests, which must be supported by probable cause.  S*ee, e.g., Florida v. Bostick*, 501 U.S. 429 (1991); *Florida v. Royer*, 460 U.S. 491 (1983); *United States v. Griffith*, 533 F.3d 979, 983 (8th Cir. 2008) (consensual encounters)*; United States v. Sokolow*, 490 U.S. 1 (1989); *Reid v. Georgia*, 448 U.S. 438 (1980); *Terry v. Ohio*, 392 U.S. at 16; *Griffith*, 533 F.3d at 983-84; *United States v. Saenz*, 474 F.3d 1132, 1136 (8th Cir. 2007) (investigative stops).  The government has the burden to prove the personal encounter was voluntary, or that justification otherwise existed for each increasingly intrusive restraint on the defendant.  *See Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004).  A statement obtained as the result of an illegal detention cannot be used to establish probable cause for the detention, in the

absence of circumstances—such as *Miranda* warnings—purging the taint of that detention.
*United States v. Flores-Sandoval*, 422 F.3d 711, 714 (8th Cir. 2005).

"Determining which police-citizen contacts fall within the protections of the Fourth Amendment and which do not is fact intensive and turns on the unique facts of each case." *Griffith*, 533 F.3d at 983.  When the actions of the police do not show an unambiguous intent to restrain or when an individual's submission to a show of governmental authority takes the form of passive acquiescence, "a seizure occurs if 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave,' or 'to decline the officers' requests or otherwise terminate the encounter.'" *Brendlin v. California*, 551 U.S. 249, —, 127 S. Ct. 2400, 2405-06 (2007) (*quoting United States v. Mendenhall*, 446 U.S. 544, 554 (1980) and *Florida v. Bostick*, 501 U.S. at 435-436).  Although authorized as a legitimate law enforcement tactic, a "knock and talk" can become illegal if police assert their authority, refuse to leave, or to otherwise make the people inside feel they cannot refuse to open up.  *United States v. Spotted Elk*, 548 F.3d 641, 655 (8th Cir. 2008).

Although it is a settled rule that warrantless arrests in public places are valid, a greater burden is placed on officials who enter a home or dwelling without consent. *Payton*, 445 U.S. at 586.  Because "[t]o be arrested in the home involves not only the invasion attendant to all arrests but also an invasion of the sanctity of the home," such an arrest "at least in the absence of exigent circumstances, even when it is accomplished under statutory authority and when probable cause is clearly present" is "simply too substantial an invasion to allow without a warrant."  *Id.* at 589 (*quoting United States v. Reed*, 572 F.2d 412, 423 (2d Cir. 1978)); *United States v. Almeida-Perez*, 549 F.3d 1162, 1169 (8th Cir. 2008) (stating "[g]enerally, the Fourth Amendment requires the police to

obtain a warrant before entering a home" and noting that when "police have entered a defendant's house without a warrant, the burden is on the prosecution to prove that the police acted pursuant to a valid exception to the warrant requirement.").

### 2.  Immigration/administrative arrest or detention

Immigration law is generally regulatory rather than criminal and deportation hearings are civil proceedings.  *Immigration & Naturalization Serv. v. Lopez-Mendoza*, 468 U.S. 1032, 1038 (1984).  The exclusionary rule does not apply to civil deportation proceedings, in part because "the INS has its own comprehensive scheme for deterring Fourth Amendment violations by its officers." *Id.* at 1044 (stating that "[t]o safeguard the rights of those who are lawfully present at inspected workplaces the INS has developed rules restricting stop, interrogation, and arrest practices" and the "regulations require that no one be detained without reasonable suspicion of illegal alienage, and that no one be arrested unless there is an admission of illegal alienage or other strong evidence thereof.") *Id.*

The Fourth Amendment, however, does provide protection against random or gratuitous questioning related to an individual's immigration status. *Rajah v. Mukasey*, 544 F.3d 427, 441 (2nd Cir. 2008).  For example, government agents may not stop a person for questioning regarding his citizenship status without a reasonable suspicion of alienage. *United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975) (rejecting the argument that a person's apparent Mexican ancestry alone justifies belief that he or she is an alien and satisfies the requirement of the statute allowing interrogation and arrests of aliens).   A law enforcement officer may question a driver and passengers about their citizenship and immigration status in a random traffic stop only at, or within close proximity to the border. *Brignoni-Ponce*, 422 U.S. at 882.  Even after such a stop, any further detention or search must be based on consent or probable cause.  *Id.* (noting that "[f]or the same reasons that

the Fourth Amendment forbids stopping vehicles at random to inquire if they are carrying aliens who are illegally in the country, it also forbids stopping or detaining persons for questioning about their citizenship on less than a reasonable suspicion that they may be aliens.")

Immigration agents are authorized without a warrant "to arrest any alien in the United States, if [they have] reason to believe that the alien so arrested is in the United States in violation of any [law or regulation made in pursuance of law regulating the admission, exclusion, expulsion or removal of aliens] and is likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(2).  Regulations promulgated under that statute provide that "[a] warrant of arrest shall be obtained except when the designated immigration officer has reason to believe that the person is likely to escape before a warrant can be obtained."  8 C.F.R. § 287.8(c)(2)(ii) (emphasis added).  The regulations further provide that "[a]t the time of the arrest, the designated immigration officer shall, as soon as it is practical and safe to do so:  (A) Identify himself or herself as an immigration officer who is authorized to execute an arrest; and (B) State that the person is under arrest and the reason for the arrest."  8 C.F.R. § 287.8(c)(2)(iii).  In the context of an arrest under 8 U.S.C. § 1357(a), "'reason to believe' is the equivalent of probable cause." United States v. Sanchez, 635 F.2d 47, 63 (2d Cir. 1980); Au Yi Lau v. Immigration & Naturalization Serv., 445 F.2d 217, 222 (D.C. Cir. 1971).  Further, 8 U.S.C. § 1357 does not relax the Fourth Amendment prohibition against warrantless entry into private dwellings. United States v. Castellanos, 518 F.3d 965, 971-72 (8th Cir. 2008).

Immigration agents are also authorized under the statute to interrogate suspected aliens for possible violations of immigration laws.  8 U.S.C. § 1357(a)(1).  Under the interrogation component of the statute, immigration officers may "may make forcible

detentions of a temporary nature for the purposes of interrogation under circumstances creating a reasonable suspicion, not arising to the level of probable cause to arrest, that the individual so detained is illegally in this country." *Au Yi Lau*, 445 F. 2d at 223 (applying *Terry* standards). A plain reading of this statute requires the government to show that immigration officials *believe* that a person is an alien before questioning him. *United States v. Flores-Sandoval*, 422 F.3d 711, 714 (8th Cir. 2005) (emphasis in original); *see also* 8 C.F.R. § 287.8(b)(2) (an immigration official may briefly detain the person for questioning if he has a reasonable suspicion based on specific articulable facts that the person is engaged in an offense against the United States or is an alien illegally in the United States). The underlying rationale for the application of the relaxed *Terry* standards to these interrogations is that the minimal invasion of privacy of an individual approached for questioning is justified by the special needs of immigration officers who make such interrogations. *Shu Fuk Cheung v. INS*, 476 F.2d 1180, 1983 (D.C. Cir. 1971) ("This allowance for mere questioning, which assumes the individual's cooperation, is analogous to decisions which have contemplated the same scope of authority for police officers").

C. Fruit of the Poisonous Tree

The exclusionary rule applies to both direct and indirect fruits of the constitutional violation, including verbal statements. *Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963); *see also United States v. Yousif*, 308 F.3d 820,829 (8th Cir. 2002). "'The exclusionary rule, . . . when utilized to effectuate the Fourth Amendment, serves interests and policies that are distinct from those it serves under the Fifth Amendment." *Taylor v. Alabama*, 457 U.S. 687, 690 (1982) (*quoting Brown v. Illinois*, 422 U.S. 590, 602 (1975)). "The exclusion of a confession made without *Miranda* warnings might be regarded as

necessary to effectuate the Fifth Amendment, but it would not be sufficient fully to protect the Fourth." *Brown*, 422 U.S. at 600-01.

In the Fourth Amendment context, the sole purpose of the exclusionary rule is to deter future unlawful police conduct. *Michigan v. Tucker*, 417 U.S. 433, 446 (1974). "Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it." *Id.* (quoting *Elkins v. United States*, 364 U.S. 206, 217 (1960)). Violations of the Fourth Amendment have traditionally mandated a broad application of the "fruits of the poisonous tree" doctrine. *Oregon v. Elstad,* 470 U.S. at 306. Under the Fourth Amendment, in order to break a causal chain between an illegal arrest and a statement made subsequent thereto, "*Wong Sun* requires not merely that the statement meet the Fifth Amendment standard of voluntariness, but that it be 'sufficiently an act of free will to purge the primary taint.'" *Brown*, 422 U.S. at 601-02 (quoting *Wong Sun*, 371 U.S. at 486). "The controlling question is 'whether granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *Yousif*, 308 F.3d at 829 (quoting *Wong Sun*, 371 U.S. at 488); *Immigration & Naturalization Serv. v. Lopez-Mendoza*, 468 U.S. at 1040-41 (stating that the general rule in a criminal proceeding is that statements and other evidence obtained as a result of an unlawful, warrantless arrest are suppressible if the link between the evidence and the unlawful conduct is not too attenuated); *United States v. Hernandez-Hernandez*, 384 F.3d 562, 565 (8th Cir. 2004) ("Statements that result from an illegal detention are not admissible.").

Any evidence "obtained by exploitation of [an unlawful detention] instead of by means sufficiently distinguishable to be purged of the primary taint" must be excluded. *United*

*States v. Flores-Sandoval*, 422 F.3d at 714 (8th Cir. 2005). In some cases, giving a *Miranda* warning may break the causal chain between the illegal arrest and the statement, thereby rendering the statement admissible. *Id*. The government, however, bears the burden of showing the admissibility of the statement, i.e., that a defendant waived his *Miranda* rights and made a free and voluntary confession. See *id*. (finding that an unwarned statement allegedly made to Border Patrol must be suppressed and may not be invoked as providing a proper basis for immigration authorities to place defendant in custody and obtain additional statements). In that situation, a finding of "voluntariness" for purposes of the Fifth Amendment is merely a threshold requirement for a Fourth Amendment analysis. *Taylor*, 457 U.S. at 690; *Dunaway v. New York*, 442 U.S. 200, 217 (1979).

In contrast, any blanket suppression rule under the Fifth Amendment for a *Miranda* violation must meet the requirement that there be a close fit between the Self-Incrimination Clause and any application of a suppression rule proposed to protect it. *Patane*, 542 U.S. at 635. Under *Miranda*, compelling a statement is not the violation, the violation is admitting the statement into evidence. *Chavez v. Martinez*, 538 U.S. 760, 772 (2003). Thus, "the *Miranda* presumption, though irrebuttable for purposes of the prosecution's case in chief, does not require that the statements and their fruits be discarded as inherently tainted" for all other purposes. *Id.* at 307. *Miranda* gives way to countervailing concerns of public safety and an unwarned statement can be used for impeachment purposes. *New York v. Quarles*, 467 U.S. 649, 657 (1984); *Harris v. New York*, 401 U.S. 222, 224 (1971); and *Oregon v. Hass*, 420 U.S. 714, 715-16 (1975). Also, if the circumstances of the defendant's custody do not concern the sort of police conduct *Miranda* sought to deter, and the trustworthiness of the trial testimony is not at issue, evidence derived from unwarned statements need not be excluded. See *Michigan v. Tucker*, 417 U.S. at 449. When the

central concerns of *Miranda* —"the general goal of deterring improper police conduct" and "the Fifth Amendment goal of assuring trustworthy evidence"—are not likely to be implicated, the "fruit if the poisonous tree" doctrine will not apply to preclude the *Miranda*-offending evidence. *See Missouri v. Seibert*, 542 U.S. 600, 618-19 (2004) (Kennedy, J., concurring). However, when *Miranda* is deliberately violated for tactical reasons, such as "in a police strategy adapted to undermine the *Miranda* warnings," postwarning statements that are related to the substance of prewarning statements must be excluded. *Id.* at 616-17 (plurality opinion). Accordingly, a failure to administer *Miranda* warnings does not justify automatic exclusion of the physical fruits of otherwise voluntary confessions. *Patane*, 542 U.S. at 636-37.

Protection under *Miranda* is augmented by additional safeguards "when an accused has invoked his right to have counsel present during a custodial interrogation, a valid waiver of that right cannot be established by showing only that [a defendant] responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1980) ("[A]n accused . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him."). "It is inconsistent with *Miranda* and its progeny for the authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel."

III.   ANALYSIS

The court finds the magistrate judge erred in finding that the questioning of the defendants by ICE Officer Becker over the phone was a mere administrative inquiry or a consensual encounter. Although the court agrees that the episode at the trailer began as

a consensual encounter— a legitimate "knock and talk"— the continued detention of the defendants past the point at which they had produced apparently valid forms of identification, answered the officer's questions, and denied permission to enter or search the trailer, was an investigative detention that required a reasonable, articulable suspicion of wrongdoing.   The court agrees with the magistrate judge's finding that Becker's suspicion of criminal activity before conducting the interrogation at the Platte County jail turned that encounter into more than a mere administrative inquiry.  The same can be said for the phone encounter, however.  At the time of the phone calls, the drug task force officers suspected drug trafficking activity and their call to immigration reflects nothing more than a "hunch" that the defendants' immigration status was questionable.  Officer Bignell testified that he had no reason to think the defendants were illegal aliens when he made the call to ICE Officer Becker.  Becker, however, was aware, at the least, that Bignell and Molczyk were drug task force investigators and may have been told that the officers had received reports of drug trafficking.   These actions take Becker's allegedly "routine" questioning out of the realm of a legitimate status inquiry and into the realm of the sort of questioning that requires a *Miranda* warning.

The court also finds the unwarned statements made on the phone to Deportation Officer Becker cannot be characterized as voluntary.  Application of the *Griffith* factors weighs in favor of a finding of custody for *Miranda* purposes.  The defendants were not informed that they were free to terminate the encounter.  Their freedom of movement was limited and Trooper Hicks testified that he would have detained them if they tried to leave. The defendants did not initiate the contact, the atmosphere was police-dominated, and the defendants were placed under arrest at the end of the questioning.  Two vehicles and three

law enforcement officers were at the scene.  The officers wore clothing that identified them as police officers and weapons were visible.  Valenzuela-Machado was almost immediately removed from the area outside the trailer, escorted to the patrol car and then placed in the "cage" of the vehicle.

Most importantly, defendant Jose Villa-Gonzalez was subjected to a warrantless illegal seizure within his home in violation of the Fourth Amendment.  Law enforcement officers had twice been denied entry into the home.  Officer Bignell and Trooper Hicks candidly admit that they entered the home without consent or permission.  They do not rely on any exigencies to justify their entry.

Once it has been established that the individuals are "in custody," the government bears the burden of proving the voluntariness of the statements.  The government has not sustained that burden.  The drug task-force officers requested the assistance of ICE knowing that the questioning of the defendants was designed to elicit incriminating statements.  The evidence shows that the defendants were told, not asked, to answer questions propounded by the ICE officer on the phone.  The atmosphere was coercive and the defendants were not free to refuse the request.

Under these circumstances, no reasonable person in the defendants' position would have felt free to leave, to refuse to answer questions or to terminate the encounter.  There is no evidence that Investigator Bignell returned the defendants' identification to them at the conclusion of the ostensibly consensual conversation at the door of the trailer. Importantly, this was not a traffic stop, wherein the exigencies presented by the mobility of a vehicle and the public's interest in traffic safety justify a greater intrusion.  The defendants were in the privacy of their home and were under no obligation to provide

22

identification, in contrast or the obligation of a person driving an automobile to provide a driver's license to authorities.

The defendants' immigration status does not affect this analysis. The standard required to briefly detain an individual for interrogation for immigration purposes also requires a reasonable articulable suspicion of wrongdoing or illegal alien status. That suspicion cannot be based on national origin or appearance of national origin alone. The brief investigative detention of the defendants to determine immigration status quickly became a full-scale "administrative arrest" at which time the "reason to believe" the defendants were illegal aliens would have had to equate to probable cause. The officers conceded that they had no probable cause to arrest the defendants other than ICE Officer Becker's instruction to do so. At the point the defendants were handcuffed and transported to the jail, they were undeniably in custody. Notably, this is not a situation where the officers had confirmed before they encountered defendant Trinidad Villa-Gonzalez that he had entered the country illegally after being deported. *See Castellanos*, 518 F.3d at 972 n.2.

The court finds the magistrate judge erred in applying Fifth Amendment jurisprudence to the "fruits of the poisonous tree" analysis under the facts of this case. The relevant inquiry is whether the search warrant was obtained with information that was the result of an illegal detention of the defendants, not whether it was obtained via a *Miranda* violation. A statement made in a custodial interrogation after an illegal seizure must be suppressed unless the government shows attenuation, that is, that intervening events broke the causal chain between the illegality and the statements. Nor can Trinidad Villa-Gonzalez's statement to Officer Bignell at the Platte County jail on May 30, 2008, serve as

an act of free will sufficient to purge the taint of the earlier violations.  The court finds that Trinidad Villa-Gonzalez requested an attorney and did not subsequently make a knowing and voluntary waiver of that right.  The court's review of the audiotape of the interview shows that Trinidad Villa-Gonzalez made a clear request for an attorney by inquiring when the attorney would arrive.  In the context of the ensuing conversation, he clearly expressed his need for an attorney and interpreter for his upcoming court hearing.  Officer Bignell's response to his inquiry was somewhat misleading and conveyed the message that an attorney would be provided only at either the court's or the attorney's convenience.  The tone and context of the audiotape reveals an attempt to confuse the defendant and/or to undermine his assertion of his right to counsel.  Further, in the context of the entire conversation, the statement translated as "if I ask for one" can be understood as meaning "now that I ask for" an attorney, instead of implying that the defendant had not yet asked for one.  The ensuing colloquy about the upcoming hearing shows that the parties understood the defendant to have made the request.  Villa-Gonzalez's reassertion of the inquiry about the arrival of his lawyer at the end of the interview also reflects the defendant's understanding that he had earlier made the request for an attorney.  Villa-Gonzalez's statement that he understood his rights, his grudging and conditional agreement to answer the officer, and his responses do not amount to a knowing and voluntary waiver of the right to an attorney that he previously asserted.

Moreover, even under the Fifth Amendment, application of *Patane* to the physical evidence acquired as the indirect result of an unwarned statement requires that the statement be voluntary.  Also, the concerns of *Miranda,* specifically deterrence of police misconduct, are implicated in this case.  Accordingly, the court finds the evidence seized

24

in the search of defendants' trailer must be suppressed. In view of the foregoing, the court need not address defendant Jose Villa-Gonzalez's contention that the search warrant was invalid because it did not set out the items and places to be searched with specificity.

THEREFORE, IT IS ORDERED:

1.   The defendants' objections (Filing Nos. 45 & 47) to the report and recommendation of the magistrate judge are sustained.

2.   The report and recommendation of the magistrate judge (Filing No. 44) is adopted in part and rejected in part.

3.  The motion to suppress (Filing No. 26) filed by defendant Trinidad Villa-Gonzalez is granted.

4.  The motion to suppress statements (Filing No. 29) filed by defendant Jose Manuel Villa-Gonzalez is granted.

5.  That the motion to suppress evidence (Filing No. 28) filed by defendant Jose Manuel Villa-Gonzalez is granted.

DATED this 16th day of March, 2009.

BY THE COURT:


s/ Joseph F. Bataillon
Chief United States District Judge